**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STONEMOR, INC.,<br><br>             Petitioner,<br><br>      v.<br><br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS, LOCAL 469,<br><br>             Respondent. | Civ. A. No. 3:22-cv-1388 (GC) (LHG)<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

     **THIS MATTER** comes before the Court upon Petitioner Stonemor, Inc.'s (the "Employer" or "Petitioner") Petition and Motion to Vacate Arbitration Award (the "Petition"), (*see* ECF Nos. 1 & 2), and Respondent International Brotherhood of Teamsters, Local 469's ("Respondent" or the "Union") Cross-Motion and Opposition, (*See* ECF No. 4). The Court has jurisdiction pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). On January 25, 2023, the Court held oral argument. (*See* ECF No. 12). For the reasons set forth herein, and for good cause shown, the Employer's Motion to Vacate is **GRANTED**, and the Union's Cross-Motion to Confirm is **DENIED**.

## I.    BACKGROUND

     This action arises from an arbitration decision construing the terms of the parties' Collective Bargaining Agreement (the "CBA"). The parties submitted two disputes to the Arbitrator for resolution: the substantive dispute, which was to determine whether the Union's employees would be entitled to two wage increases in 2020, in accordance with the schedule

outlined in the Wages clause of the CBA, (*see* Wages, TA § F, Pet. Ex. B, ECF No. 1-3; Wages, CBA § 12.1(c), Pet. Ex. H, ECF No. 1-9); and the procedural dispute, *i.e.*, whether the substantive dispute was timely filed, per the Grievance Procedure provided by the CBA, (*see* Grievance Procedure, TA § 8, Pet. Ex. B; Grievance Procedure, CBA § 12, Pet. Ex. H).  As posed by the Arbitrator, "[t]he questions in this case are whether the grievance was timely filed and whether the CBA mandates an annual percentage increase in the first year of the contract."  (*See* Arbitrator's Opinion & Award ("Op.") 7, Pet. Ex. A, ECF No. 1-2.)

The substantive dispute between the parties turned on whether the Employer was required to increase wages on October 1, 2020, after an initial one-time increase was effectuated on September 1, 2020.  (Op. 7-8, Pet. Ex. A; *see* Wages, TA § F, Pet. Ex. B; Wages, CBA § 19.1(c), Pet. Ex. H.)  The CBA states that "[t]he Base rate [to be paid to employees hired after the effective date of the Agreement] will be $24.62 an hour starting September 1, 2020 and increase each year of the contract by 2.25% on October 1."  (Wages, TA § F, Pet. Ex. B; Wages, CBA § 19.1(c), Pet. Ex. H.)  The Union interpreted this to mean that the employees would benefit from two wage increases in 2020, the first on September 1, 2020, and the second on October 1 of the same year. The Employer anticipated a single wage increase on September 1, 2020, the first year of the contract, and that the subsequent increases would be begin on October 1 of the following year.

The procedural dispute concerned whether the Union timely filed its Grievance Report on January 5, 2021, which the CBA requires be submitted within ten (10) days of the initiating occurrence.  (*See* Grievance Report, Pet. Ex. C, ECF No. 1-4.)

On January 31, 2022, the Arbitrator issued an award finding that the grievance was timely filed, and that the Employer violated the CBA by failing to implement the annual percentage wage increase on October 1, 2020.  (*See* Op. 10, Pet. Ex. A).

On March 15, 2022, the Employer filed a Petition to Vacate Arbitration Award with its Motion to Vacate Arbitration Award. (*See* ECF Nos. 1 & 2.) The Union filed a Cross-Motion and Opposition on April 5, 2022, (*see* ECF No. 4), and the Employer replied on April 25, 2022, (*see* ECF No. 9). The Employer contends that the Arbitrator exceeded the scope of her authority under the CBA and under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a) by "issu[ing] an award without any plausible basis in the CBA." (*See* Pet'r's Reply 2, ECF No. 9.) The Union argues that the Arbitrator acted pursuant to authority conveyed under the FAA, specifically 9 U.S.C. §§ 9 & 13, and requests confirmation of the Arbitration Award. (*See* Cross-Pet. ¶ 1, ECF No. 4-1.)

### A.    Factual Background

The Employer operates cemeteries and funeral homes in multiple states, among them Beth Israel and Clover Garden in northern New Jersey.[1] (Op. 2, Pet. Ex. A.) The employees at these cemeteries were certified as a single bargaining unit on March 7, 2019, after which the Union initiated negotiations of the CBA on behalf of the employees. (*Id.*) On September 17, 2020, the parties signed a Tentative Agreement ("TA") in which the parties intended to "be legally bound." (Preamble, TA, Pet. Ex. B.) The TA provided that "[e]mployees hired after the effective date of the Agreement [would] be paid . . . 75% of the Base rate . . . [and] [t]he Base rate [would] be $24.62 an hour starting September 1, 2020 and increase each year of the contract by 2.25% on October 1." (Wages, TA § F, Pet. Ex. B.) With respect to grievances, the TA provided that "[s]hould any grievance arise as to the interpretation of or alleged violation of this Agreement, . .

---

[1] Though the Court relies upon all submissions by the parties in ascertaining whether the Arbitrator's decision exceeded her authority, the Court affords proper deference to the factual findings of the Arbitrator. *See Citgo Asphalt Refin. Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Loc. No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004) (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). "[A] reviewing court must defer to the arbitrator's factual findings." *Id.*

. the Union . . . shall reduce it to writing . . . within ten (10) days of its occurrence in an attempt to affect a satisfactory settlement." (Grievance Procedure, TA § 8, Pet. Ex. B.)  If the dispute has not been resolved, "the issue may be appealed by the Union to mediation . . . [and] if not resolved through mediation, the Union may appeal the issue to final and binding arbitration within ten (10) days." (*Id.*)  The Grievance Procedure states that "[t]ime is of the essence." (*Id.*)

Finally, the TA provided the following:

> This Agreement is tentative until ratified by a majority of the employees employed by Stonemor at the Cemeteries at a meeting called by the Union and conducted in accordance with the Union's bylaws.  The employees working at the Cemeteries shall vote as a single unit and the Cemeteries will make up a single bargaining unit to which all provisions of this Tentative Agreement and resulting collective bargaining agreement shall apply equally.

(Preamble, TA § 1, Pet. Ex. B.)  The TA was ratified by the Union Members on October 5, 2020. (Op. 2, Pet. Ex. A.)  The parties agree that the CBA was effective as of October, 5, 2020. (*See* Tr. of Jan. 25, 2023 Oral Arg. 3:20-22 ("Tr.").

On October 9, 2020, the Employer's counsel expressed the Employer's desire to clarify that the wage increase would be implemented "each subsequent year of the contract," because as written, "it is possible for someone to claim that the first increase should be on September 1 and then again on October 1, 2020 for a total of 4.5% for the year." (Email Exchange, October 9, 2020 11:08 AM email from James R. Redeker to Kevin O'Connor, Pet. Ex. E, ECF No. 1-6.)  The Union's counsel replied that the Union's belief was that "there is an increase each year of the contract by 2.25% on October 1 and this includes October 1, 2020." (Email Exchange, October 9, 2020 2:11 PM email from Kevin O'Connor to James R. Redeker, Pet. Ex. E.)  In its responsive communication, sent on October 12, 2020, the Employer further advised the Union of its option to initiate its dispute resolution process,

4

> Attached is the revised draft cba.  You will note that the Wage
> provision has been modified to reflect our actual agreement.  I will
> recommend to my client that it not pay an additional 2.25% increase
> to the base rate as of October 1, 2020, because that was not our
> agreement.  **You can file a grievance, if you wish, and we will
> arbitrate the issue.**

(Email Exchange, October 12, 2020 3:31 PM email from James R. Redeker to Kevin O'Connor,

Pet. Ex. E (emphasis added).)  The parties next attempted resolution through mediation to no avail.

(*See* Op. 5, Pet. Ex. A.)

The parties further negotiated the CBA from October 2020 through December 2020.  (Op.

2-3, Pet. Ex. A.)  The CBA was fully executed by the parties on December 29, 2020.  (*See* CBA,

Pet. Ex. H.)  Similar to the TA, the CBA provides that "[e]mployees hired after the effective date

of the Agreement will be paid . . . 75% of the Base rate . . . [and] [t]he Base rate will be $24.62 an

hour starting September 1, 2020 and increase each year of the contract by 2.25% on October 1."

(*See* Wages, CBA § 19.1(a), (c), Pet. Ex. H.)  The CBA's Grievance Procedure is also identical to

the TA in that it requires the Union to reduce the grievance "to writing . . . within ten (10) days of

its occurrence" and that "[t]ime is of the essence."  (*See* Grievance Procedure, CBA § 12, Pet. Ex.

H.)

On January 5, 2021, the Union filed a formal grievance pursuant to the CBA.  (*See*

Grievance Report, Pet. Ex. C, ECF No. 1-4.)  The Grievance Report states: "On or about

12/30/2020 and continuing, the company has not implemented the October 1, 2020 wage increase

as per Article 19 Wages 1(c) of the Collective Bargaining Agreement."  (*Id.*)  The Employer denied

the Grievance Report on January 7, 2021.  (*See* Employer Response to Wage Increase Grievance,

Pet. Ex. D, ECF No. 1-5.)  The parties then agreed to submit the issues to arbitration.  (*See* Op. 2-

3, Pet. Ex. A; Grievance Procedure, Step Two, TA § 8, Pet. Ex. B; Grievance Procedure, Step

Two, CBA § 12, Pet. Ex. H.)  The Arbitrator conducted a hearing via Zoom on November 22,

2021, at which the parties "appeared through their representatives who presented witnesses and evidence, and made arguments." (Op. 3, Pet. Ex. A.) Post-hearing briefing was exchanged on January 5, 2022, and the Arbitrator issued her Opinion and Award on January 31, 2022. (*See id.* at 3.)

### B.    Arbitrator's Opinion & Award

In her Opinion, the Arbitrator summarized the dispute as follows,

> On January 5, 2021, the Union filed a grievance asserting that the plain language of the CBA requires the Employer to implement the base wage rate effective on September 1, 2020, and an annual increase to the base wage on October 1 for each year of the contract, but that the Employer did not implement the October 1, 2020, wage increase. The Employer asserts that the grievance is untimely since the Union knew of the dispute in October, but filed the grievance well beyond the time limits specified in the CBA, and that the Employer did not violate the CBA since the parties did not agree to two wage increases for 2020.

(Op. 2-3, Pet. Ex. A.)

The Arbitrator provided a detailed description of the parties' negotiations concerning the wage dispute. After the employees were certified as a bargaining unit on March 7, 2019, the parties began negotiating the CBA, and the Union sought retroactive back pay to the date of the bargaining unit certification. (*Id.* at 4, 5.) The Employer rejected this proposal, but in September 2020 the parties agreed on a retroactive application date of September 1, 2020, with the addition of the October 1 increase trigger of 2.25% of base pay for each year of the contract. (*Id.*) The parties signed the TA on September 17, 2020, and, after a failed attempt at ratification on September 30, 2020, the employees ratified the TA on October 5, 2020. (*Id.*)

At the arbitration hearing, the Union's Business Agent testified that on October 6, 2020, the Employer submitted the first draft of the CBA to the Union, and at that time the Employer claimed there was an error in drafting the wage provision of the CBA. (*Id.* at 4.) The Employer

proposed adding the word "subsequent" as a qualifier to the October 1 date in the wage increase provision, but the Union rejected that proposal. (*Id.* at 4-5.)  On cross examination, the Union's Business Agent testified that "the Employer did not propose two wage increases a month apart during negotiations, but the TA language was clear that the base wage rate would increase each year of the contract on Oct 1." (*Id.* at 5.)  He testified that "the Union could not file a grievance until the CBA was fully executed." (*Id.*)

The Employer's North-Division President recounted a similar version of events, in that the Union wanted retroactive pay back to the certification date (of March 2019), but that the Employer rejected that proposal and instead agreed to the Union's base wage rate and the 2.25% annual wage increase. (*Id.*)  He testified that "in September 2020 the Union requested a spreadsheet to see how the wage would affect each employee, and that the Employer provided the spreadsheet with one increase per year." (*Id.*)  With respect to the filing of the grievance, the Employer's President testified that the Union was aware of the conflict in October 2020 but did not file a grievance at that time and that the signing of the CBA in December 2020 "was a formality since the TA was ratified in October 2020 and went into effect before the CBA was fully executed." (*Id.* at 6.)

The Arbitrator concluded that there "is no dispute that [the] Employer implemented the agreed upon base wage rate effective September 1, 2020." (*Id.* at 7.)  With respect to the annual percentage increase the Arbitrator held as follows:

> [T]he CBA is clear and does not exclude that annual percentage increase for 2020.  The evidence shows that the parties agreed to the TA provisions in September 2020 after nearly 18 months of extensive negotiations, that neither side questioned or clarified the TA wage provision language before it was signed, and that after the TA was ratified the Employer claimed that there was a mistake made in drafting the TA and proposed that the language be modified to clarify the intent.  The Employer's attempt to modify the TA language acknowledges that the plain language establishes a base wage rate retroactive to September 1 and an annual percentage

> increase to the base rate on October 1 for each year of the contract,
> with no exception for the first year of the contract.  The language in
> the CBA does not state each "subsequent" year of the contract, as
> the Employer proposed, a proposal that the Union rejected.  The
> unrefuted evidence is that the Employer did not include the TA wage
> provision in the CBA drafts until December 2020, and that although
> the parties signed the CBA on December 29, 2020, the Employer
> continued to insist in written communications to the Union that it
> did not agree to two wage increases for 2020.

(*Id.* at 8-9.)

The Arbitrator also held that the Union's grievance was timely filed.  (*Id.* at 7-8.)  The

Arbitrator stated:

> The Union provided unrefuted evidence that the Employer did not
> include the TA wage provisions in the CBA drafts until December
> 2020.  It is reasonable that the Union would ensure that the TA
> language was incorporated in the CBA before it filed a grievance
> asserting that the Employer violated the CBA.  Moreover, the
> Union was not required to file a grievance while the parties were
> continuing to clarify and negotiate the provisions of the CBA until
> the CBA was fully executed.  The CBA was fully executed by the
> parties on December 29, 2020, and the grievance was filed on
> January 5, 2021, which was within the time limits mandated by the
> CBA.  Thus, I find that the grievance was timely filed.

(*Id.* at 8.)

Accordingly, the Arbitrator entered an award in favor of the Union on both issues.  (*Id.* at

10.)  Specifically, the award provides that the "Employer violated the Collective Bargaining

Agreement by failing to implement the annual percentage wage increase on October 1, 2020[,]"

and ordering the Employer "to implement the annual percentage wage increase effective as of

October 1, 2020."  (*Id.* )  The Employer filed the instant application seeking vacation of the

Arbitrator's Award on the timeliness issue alone.  (*See* Pet'r's Mot., ECF No. 2.)

## II.    LEGAL STANDARD

A collective bargaining agreement represents a contractual agreement between an employer and its employees. *Brentwood Med. Assocs v. United Mine Workers of Am.*, 396 F.3d 237, 240 (3d Cir. 2005). "If such a contract includes an arbitration clause, it is assumed that the parties bargained for a grievance resolution procedure in which an arbitrator would interpret the agreement. It is thus not the role of a court to correct factual or legal errors made by an arbitrator." *Id.* (citing *Major League Umpires Ass'n v. Am. League of Pro. Baseball Clubs*, 357 F.3d 272, 279 (3d Cir. 2004)). "A district court may determine only whether or not an arbitrator's award 'draws its essence' from the parties' collective bargaining agreement." *Id.* (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

An award draws its essence from a collective bargaining agreement if its interpretation can *in any rational way* be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention. *Id.* at 241 (citing *United Transp. Union Loc. 1589 v. Suburban Transit Corp.*, 51 F.3d 376, 379-80 (3d Cir. 1995)). "As a general rule, [the court] must enforce an arbitration award if it was based on an arguable interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects manifest disregard of the agreement, totally unsupported by principles of contract construction." *Id.* (citing *Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 360 (3d Cir. 1993)). Therefore, the court "will not disturb an arbitration award 'even if we find the basis for it to be ambiguous or disagree[] with [the arbitrator's] conclusions under the law.'" *Id.* (citing *Citgo Asphalt Refin. Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union Loc. No. 2-991*, 385 F.3d 809, 816 (3d Cir. 2004)).

There is also a "strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, in favor of enforcing arbitration awards." *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).   As such, an award is presumed valid unless it is affirmatively shown to be otherwise, and the validity of an award is subject to attack only on those grounds listed in 9 U.S.C. § 10[(a)(1)-(4)] or if enforcement of the award is contrary to public policy.   (*Id.*)   The FAA articulates four grounds upon which a district court may vacate an arbitration award:

> (1)   where the award was procured by corruption, fraud, or undue means;
>
> (2)   where there was evidence of partiality or corruption in the arbitrators, or either of them;
>
> (3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

FAA, 9 U.S.C. § 10(a)(1)-(4).

"[R]eview under § 10 focuses on misconduct rather than mistake." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350–51 (2011).   In order to vacate an arbitration award, the opposing party "must clear a high hurdle." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).   "It is not enough for petitioners to show that the panel committed an error—or even a serious error." (*Id.*)   "'It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively "dispense[s] his own brand of industrial justice" that his decision

10

may be unenforceable.'"  *Id.* (alterations in original) (quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)).

Here, the Employer contends that the Arbitrator exceeded her authority contrary to 9 U.S.C. § 10(a)(4) by "ignore[ing] the plain language of the grievance procedure" in the CBA and "creating an exception to the grievance procedure where none existed." (*See* Pet'r's Br. 11.)  An arbitrator exceeds his or her authority by deciding an issue "not submitted to him [or her], grant[ing] relief in a form that cannot be rationally derived from the parties' agreement and submissions, or issu[ing] an award that is so completely irrational that it lacks support altogether." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219–20 (3d Cir. 2012).  When the arbitrator makes a good faith attempt to interpret the parties' agreement, "even serious errors of law or fact will not subject his award to vacatur." *Id.* at 220; *see also Brentwood Med. Assocs.*, 396 F.3d at 243.  Indeed, a court "may not overrule an arbitrator simply because [it] disagree[s]." *Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Acct.*, 618 F.3d 277, 295 (3d Cir. 2010) (quoting *United Transp. Union Loc. 1589* , 51 F.3d at 379 ).  Rather, "[t]here must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award." *Id.* at 295–96 (quoting *United Transp. Union Loc. 1589*, 51 F.3d at 379).  "[A]s long as the arbitrator's award is drawn from the essence of the collective bargaining agreement, a court may not vacate it even if the court finds the basis for it to be ambiguous or disagrees with its conclusions under the law." *Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters*, 969 F.2d 1436, 1441 (3rd Cir. 1992).

## III.  **DISCUSSION**

The Employer argues that the Arbitrator "exceeded her powers by determining that the Grievance was timely and then adjudicating the merits of a time-barred dispute." (*See* Pet'r's Br.

9.) The Employer asserts that the role of the court is not to "rubber stamp" an arbitrator's decision and that a court may vacate an award "if it is entirely unsupported by the record or if it reflects a manifest disregard of the agreement." *Id.* at 10 (citing *Hamilton Park Health Care Ctr. Ltd. v. 1199 SEIU United Healthcare Workers E.*, 817 F.3d 857, 861 (3d Cir. 2016); *Citgo Asphalt Ref. Co.* , 385 F.3d at 816). The Employer cites *Monongahela Valley Hosp. Inc. v. United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO CLC*, 946 F.3d 195, 200 (3d Cir. 2019) where the Third Circuit vacated an arbitration award pursuant to Section 10 of the FAA where the arbitrator ignored the plain language of the collective bargaining agreement and "deviated far beyond the scope of his authority by force-feeding [an additional] requirement into the CBA." *Id.* The Employer contends that the Arbitrator exceeded her powers by creating an exception to the grievance procedure where none existed. *Id.* at 11.

The Employer also argues that the court can overturn an arbitration award if "the arbitrator fails to adhere to basic principles of contract construction." *Id.* The Employer asserts that the Arbitrator "did just that by ignoring the fact that the Agreement went into effect on October 5, 2020" and the agreement expressly stated that it was "tentative until ratified." *Id.* According to the Employer, the circumstances in this case are consistent with those in *Southwest Airlines Co. v. Local 555, Transp. Workers Union of Am. AFL-CIO*, 912 F.3d 838, 840 (5th Cir. 2019), where the Fifth Circuit Court of Appeals vacated an arbitration award finding that the arbitrator went "too far" and "ignored the unambiguous terms of the CBA."

Finally, the Employer argues that the arbitrator issued a decision that was outside the scope of her contractual authority as the CBA provides that the "arbitrator shall not have jurisdiction to add to, modify, vary, change or remove any terms of this Agreement. . . ." *Id.* at 13. Accordingly, the Employer requests that the court vacate the entire award as the Union waived its right to

arbitrate the underlying claims by failing to file the grievance within the time limits set forth in the CBA. (*Id.* at 14-15.)

In response, the Union asserts that there is a strong presumption in favor of enforcing arbitration awards and an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits." (Cross Pet., Br.6.) (citing *Sutter*, 569 U.S. at 569 (internal quotations omitted)). The "sole question" is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." (*Id.*) .

The Union asserts that the Arbitrator did not ignore the plain language of the CBA when she determined that the Union's grievance was timely. *Id.* at 6-7 (citing *National Ass'n of Letter Cameras, AFL-CIO v. United States Postal Serv.*, 272 F.3d 182, 186 (3d Cir. 2001); *Newark Morning Ledger Co. v. Newark Typographical Union Loc.*, 797 F.2d 162, 165 (3d Cir. 1986)). According to the Union, the Arbitrator based her ruling that the grievance was timely in the language of the CBA itself, "taking some context from the parties' interactions between the ratification of the [TA] and the final execution of the CBA[]" – namely the negotiations that took place between October and December 2020. *Id.* at 7. The Union asserts that the parties' "ongoing negotiations and communications regarding the draft terms of the CBA between the Union's ratification of the [TA] and the filing of the grievance rendered the grievance timely." *Id.* at 13 (citing *Allegiant Air, LLC v. Int'l Bhd. of Teamsters*, 2022 WL 717592 (D. Nev. Mar. 10, 2022)).

The Court vacates the decision of the Arbitrator because her decision is rendered outside of her authority, as her decision that the Grievance was timely filed finds no basis in the underlying contract. Indeed, the Arbitrator's finding that the Grievance was timely filed in January 2021 directly contradicts the plain meaning of the language of the Grievance Procedure in the CBA. The CBA was enforceable as soon as it was ratified by the Union members. (*See* Preamble, TA

§ 1, Pet. Ex. B ("These agreements are tentative until ratified by the employees.").)  The parties

signed the CBA on September 17, 2020, and the employees successfully ratified the TA on October

5, 2020.  (*See* Op. 2, Pet. Ex. A.)  "Union ratification is generally considered to be 'the last act

necessary . . . to create a meeting of the minds and an enforceable agreement." *Mack Trucks, Inc.*

*v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 856 F.2d 579,

592 (3d Cir. 1988) (quoting *NLRB v. Deauville Hotel*, 751 F.2d 1562, 1569 n.10 (11th Cir. 1985))

(finding that the parties had consummated the CBA following ratification by the employees, not

upon execution of the agreement); (*see also* Preamble, TA § 1, Pet. Ex. B).  Indeed, the parties

agree that as of October 5, 2020, the parties had an enforceable agreement.  Therefore, both the

Union and the Employer bound themselves to adhere to the dispute resolution mechanism in their

agreement.

The CBA provides a mechanism for addressing grievances "aris[ing] as to the

interpretation of or alleged violation of [the CBA]" in steps.  (*See* Grievance Procedure, TA § 8,

Pet. Ex. B; Grievance Procedure, CBA § 12, Pet. Ex. H.)  The Grievance Procedure requires that,

"[s]hould any grievance arise as to the interpretation of or alleged violation of this Agreement, the

employee or employees affected, or the Union shall process the grievance in accordance with the

following procedure."  (*See id.*)

> Step One:  In the event of a grievance, the employee(s) or Union
> shall reduce it to writing and take it up with the Superintendent or
> his/her designee **within ten (10) days of its occurrence** in an
> attempt to affect a satisfactory settlement.  The Superintendent or
> his/her designee and the Union shall have ten (10) days after the
> grievance was first presented to settle the matter.  If no satisfactory
> settlement is reached, the Union may, within ten (10) days after the
> Cemetery's answer, appeal to Step Two.

(*Id.* at Step One (emphasis added).)  Step Two contemplates the expiration of the deadlines, and

prescribes that the deadlines may only be extended by written consent of both parties,

> Step Two: If the dispute has not been resolved at Step One, the issue
> may be appealed by the Union to mediation through the Federal
> Mediation and Conciliation Service within ten (10) calendar days
> after the receipt of the answer or the expiration of the deadlines in
> Step 1, **unless mutually extended, in writing**, by the parties.
>
> If the dispute is not resolved through mediation, the Union may
> appeal the issue to final and binding arbitration within ten (10) days.

(*Id.* at Step Two (emphasis added).)   Finally, the Grievance Procedure provides the parties'

agreement regarding the consequences for failing to adhere to the procedure's stated limitations:

> Effect of Failure to Appeal:  Any grievance shall be considered as
> settled on the basis of the last answer of the Cemetery if not appealed
> to the next Step or arbitration **within the time limitations stated
> above.  Time is of the essence.**

(*Id.* (emphasis added).)  The CBA emphasizes the importance of the enforcement of the stated time

limitations by including that "[t]ime is of the essence." (Grievance Procedure, TA § 8, Pet. Ex.

B.)

### A.    The Triggering Event Occurred in October 2020

The Employer contends that either of two events were sufficient to trigger the ten (10) day

period within which the dispute resolution procedures must be initiated. (*See* Pet'r's Br. 5.) The

first incident includes the email disagreement concluding on October 12, 2020. (*See* Email

Exchange, Pet Ex. E.)  The Employer submits that a dispute arose regarding wage payment

increases under the contract after the employees had ratified the TA on October 5, 2020, which

dispute became apparent by October 12, 2020 during the parties' email communications. (Pet'r's

Br. 4; *see also* Email Exchange, Pet. Ex. E.) The Union argues that the email exchange represented

the Employer's "desire to amend the terms of the ratified Tentative Agreement, specifically

concerning the October 1, 2020 wage increase due under the terms of the agreement." (Cross-Pet.

¶ 7.)  The Employer contends that it had put the Union on notice that it will not implement an

additional wage increase, and that the Union "can file a grievance, if [it] wish[es], and we will arbitrate the dispute." (Email Exchange, October 12, 2020 3:00 PM email from James R. Redeker to Kevin O'Connor, Pet. Ex. E.)

The second colorable event, according to the Employer, occurred "when [Employer] StoneMor did not include a second wage increase in its wage payments on October 30, 2020." (Pet'r's Br. 5.) According to the Employer, "[b]ased on the Union's interpretation of the wage provision, these paychecks would have been a violation of the Agreement, constituting an independent 'occurrence' for purposes of establishing a deadline to file a grievance." (*Id.* at 5 n.3.) The Employer reasons that because its "failure to include a second increase in the payment of wages on October 30, 2020 was by direct deposit," the Union "had knowledge of that alleged occurrence on the payment date." (*Id.* at 6.)

On October 30, 2020, the Union would have had unequivocal notice that the Employer had declined to implement the October 1 wage increase in 2020, when the Union's employees were not credited with an additional 2.25% via direct deposit. (*See* Employee Earnings Statements, Pet. Ex. F.) The Union filed its Grievance Report on January 5, 2021 (*see* Grievance Report, Pet. Ex. C), more than two months after the Employer refused to implement the wage increase under the CBA (*see* Wages, TA § F, Pet. Ex. B; Wages, CBA § 19.1(c), Pet. Ex. H), which renders the filing untimely under the parties' ratified agreement.

**B.   The Arbitrator's Decision Contradicts the Plain Meaning of the CBA's Terms**

The Employer asserts that the Arbitrator's decision altered the Grievance Procedure as set out in the CBA. (Pet'r's Br. 1, ECF No. 2-1.) Further, the Employer argues that the Arbitrator "exceeded her powers by determining that the Grievance was timely and then adjudicating the merits of a time-barred dispute," particularly considering the CBA's explicit prohibition on

16

amending the terms of the contract by an arbitrator.  (*Id.* at 9; *see* Arbitration, TA § 9, Pet. Ex. B; Arbitration, CBA § 13.2, Pet Ex. H ("The arbitrator shall not have jurisdiction to add to, modify, vary, change, or remove any terms of this Agreement[.]").)  The Employer also argues that neither of the Arbitrator's findings—the first, that in consideration of the parties' continued negotiations, it was reasonable for the Union to wait until the CBA was finalized to file a grievance; and the second, that the Union was not required to file a grievance until the contract was fully executed— do not "apply the language of the CBA or draw their essence from the CBA."  (Pet'r's Reply 11.)  The Employer maintains that "[t]o interpret terms, [the Arbitrator] would have had to actually analyze and apply the grievance provision; instead, she held that the grievance was timely because she felt that the grievance procedures should not apply."  (*Id.* at 14-15.)

The Union responds that the Arbitrator's finding that the Grievance was timely filed was "premised on the parties ongoing efforts to finalize the CBA's language and to resolve their disputes amicably."  (Resp't's Cross-Pet. Br. (citing Op., Pet. Ex. A).)  The Union contends that "the Arbitrator's reasoning involved her interpretation of the CBA's grievance mechanisms, and she applied that interpretation to the record before her concerning when and how the parties finalized the terms of the CBA."  (*Id.* at 10.)  The Union requests that the Court confirm the Arbitrator's findings "that the Union's grievance was timely filed, because the parties had not finalized the terms of the CBA until the agreement was signed in December 2020, and that the [Employer] violated Article 19 of the CBA by denying the Union's members' October 1, 2020 wage increase."  (Cross-Pet. ¶ 14.)

The Arbitrator's finding that the Union was not required to file the Grievance Report until the CBA was fully executed is unavailing.  (*See* Op. 8, Pet. Ex. A.)  "In the field of labor relations, the technical rules of contract law do not determine the existence of an agreement."  *Mack Trucks,*

*Inc.*, 856 F.2d at 591-92 (collecting cases). "Adoption of an enforceable labor contract does not depend on the reduction to writing of the parties' intention to be bound." (*Id.* at 592 (collecting cases)). "Instead, courts look to the surrounding circumstances and to the parties' 'conduct manifesting an intention to abide by agreed-upon terms.'" *Id.* (quoting *Bobbie Brooks, Inc. v. Int'l Ladies' Garment Workers' Union*, 835 F.2d 1164, 1168 (6th Cir. 1987)). As in *Mack Trucks*, the parties' conduct "signifies the culmination of an agreement." *Id.* (citing *Bobbie Brooks, Inc.*, 835 F.2d at 1169). The parties included a provision in the TA that it would be effective upon ratification (*see* Preamble, TA § 1, Pet. Ex. B), and duly ratified the agreement.

Additionally, the Union argues that the Email Exchange between the parties demonstrated the Employer's "desire to amend the terms of the ratified Tentative Agreement, specifically concerning the October 1, 2020 wage increase due under the terms of the agreement." (*See* Cross-Pet. ¶ 7.) The Court finds this argument unpersuasive. "Where a new contract is not contingent upon resolution of a specific issue, that issue does not require resolution before a collective bargaining agreement can be formed." *Mack Trucks, Inc.*, 856 F.2d at 593 (citing *Georgia Kraft Co., Woodkraft Div. v. NLRB*, 696 F.2d 931, 937 (11th Cir. 1983), vacated in part on other grounds, 466 U.S. 901 (1984)). "The fact that the parties later attempted to modify the terms of the new contract does not mean that they never reached a binding agreement." *Id.* (citing *Granite State Distrib., Inc.*, 266 N.L.R.B. 457, 461 (1983) ("Subsequent efforts to modify terms are 'in no way inconsistent with the existence of the previously arrived-at agreement. It is not unusual for parties to an agreement to discuss its terms, or even to seek modification thereof, after the agreement has been arrived at.'"). The Union's argument reveals its understanding that the CBA was consummated at the time of the dispute, as does the Employer's responsive suggestion that the parties turn to the CBA's formal dispute resolution mechanism under the CBA.

The United States Court of Appeals for the Fifth Circuit treated a similar set of facts in *Southwest Airlines Company v. Local 555, Transport Workers Union of America AFL-CIO*, 912 F.3d 838 (5th Cir. 2019); (*see also* Pet'r's Br. 12-13; Resp't's Cross-Pet. Br. 7-9). In *Southwest Airlines*, the parties' TA contained a similar grievance procedure to that within the CBA in this case, which required that a grievance be submitted to the employer within "ten (10) calendar days of the occurrence of the circumstances in question." *Id.* at 841. The union in *Southwest Airlines* filed the grievance at issue "within ten (10) working days of when the CBA was signed[], but more than ten working days after [the agreement] was ratified[.]" *Id.* at 843. The arbitrator concluded that the grievance was timely filed because it was filed within ten days of signing of the CBA. *Id.* The employer, Southwest, appealed to the district court, among other reasons, because "the arbitrator's conclusion that the CBA took effect on the signing date rather than the ratification date ignored the express terms of the CBA and exceeded the scope of the arbitrator's jurisdiction." *Id.* The district court concluded that the arbitrator did not exceed the scope of his jurisdiction in finding the grievance timely filed, but on appeal regarding the timeliness issue, the Fifth Circuit found in favor of the employer, explaining,

> We hold that the arbitration award conflicts with the plain language of the CBA. It was not an arguable construction of the CBA and instead amounted to the arbitrator's own brand of industrial justice. The arbitrator's interpretation failed to account for (1) the CBA's title page that sets February 19, 2016 through February 18, 2021 as the "period" for the CBA; (2) Article 29's express language that the CBA shall "remain in full force and effect as of the date of ratification through and including February 18, 2021"; (3) the CBA's one-time bonus paid to employees working under the CBA as "of the Date of Ratification"; and (4) the parties' conduct, including Southwest's payment of the increased rates and bonuses set out in the CBA, starting after the CBA was ratified but before it was signed.

19

*Id.* at 846.  The Union argues that this matter is distinguishable from *Southwest Airlines* because the "unrefuted evidence in the arbitration hearing showed that the Company did not include the tentatively agreed language for the wage provision in the CBA drafts until December 2020," in other words, that it was reasonable for the Union to defer filing a grievance until it was certain that the provision was incorporated into the executed CBA.  (Resp't's Cross-Pet. Br. 8.)

The Union's arguments do not negate the Arbitrator's obligation to render a decision in accord with the terms of the CBA.  The CBA explicitly states that it is "tentative until ratified by a majority of the employees employed by Stonemor at the Cemeteries at a meeting called by the Union and conducted in accordance with the Union's Bylaws."  (Preamble, TA § 1, Pet. Ex. B.) As explained above, its provisions became effective on the date it was ratified by the Union's employees.  As in *Southwest Airlines*, the duration of the CBA runs from September 1, 2020 through September 30, 2024.  (*See* TA § G, Pet. Ex. B; CBA Title Page, Pet. Ex. H; Op. 3, Pet. Ex. A ("The Employer and the Union are parties to a CBA effective September 1, 2020 through September 30, 2024."); *see also Southwest Airlines*, 912 F.3d at 842.  The plain language of the CBA reflects that the Grievance Procedure required the filing of a formal report within ten (10) days of the occurrence of the dispute.  And as in *Southwest Airlines*, the parties' conduct indicates that both were aware of their obligations to resolve disputes pursuant to the terms of the CBA, particularly as articulated in the Email Exchange between counsel.  (*See* Email Exchange, Pet. Ex. E.)

As recalled by the Union, the Arbitrator found that "[i]t is reasonable that the Union would ensure that the TA language was incorporated in the CBA before it filed a grievance asserting that the Employer violated the CBA."  (Op. 8, Pet. Ex. A.)  Whether the Union acted reasonably is immaterial.  "An arbitrator's decision need be neither wise nor internally consistent[,]" *Citgo*

*Asphalt Refin. Co.*, 385 F.3d at 816 (quoting *Exxon Shipping Co.*, 73 F.3d at 1297), but the Arbitrator's findings must arise from the terms of the contract which invests her with authority. "The standard is satisfied 'if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.'" *Exxon Shipping Co.*, 73 F.3d at 1295 (quoting *Super Tire Eng'g Co. v. Teamsters Loc. Union No. 676*, 721 F.2d 121, 124 (3d Cir. 1983)). Though the parties agree that the CBA was valid and effective as of October 5, 2020, upon ratification of the TA, and the Arbitrator found that the "Employer and Union are parties to a CBA effective September 1, 2020 through September 30, 2024," (*see* Op. 3, Pet. Ex. A) the Court is able to ascertain no basis in the CBA, nor does the Arbitrator identify one in her Opinion, that the Grievance was timely filed because it was reasonable for the Union to delay pending final execution of the CBA (*see* Op. 7-8, Pet. Ex. A).

### C.  The Continuing Violations Doctrine Is Inapplicable

The Union explains that from October 12, 2020, through December 30, 2020, the parties continued to negotiate and discuss resolution of the dispute, and "also engaged in mediation under the supervision of the Federal Mediation and Conciliation Service on or about October 28, 2020." (Op. 8, Pet. Ex. A ; *see also* Resp't's Cross-Pet. Br. 3.) The Union states that throughout the continued process of negotiations, "the possibility remained that the parties would agree to alternative contract language to resolve the open disputes, including the wage dispute, and thus the Union waited until the language was finalized on December 30, 2020 to file its grievance concerning the [Employer's] violation of the agreed-upon wage increase schedule." (Resp't's Cross-Pet. Br. 3 (citing Exs. C & H).) The Union also contends that it was not required to file a

grievance while the parties were still in negotiations. (*See id.*)  In response, the Employer avers that although the parties continued to discuss the wording of the wage provision, Petitioner-Employer "never sought (and the record does not reflect it seeking) to re-negotiate wage rates post-ratification or to reopen the Agreement for any reason." (Pet'r's Br. 6, ECF No. 2-1.)

"The continuing violations doctrine is an equitable exception to the timely filing requirement." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995)).  When an action is part of a greater course of conduct, it "is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time-barred." *Brenner v. Loc. 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991).  "In order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is 'more than the occurrence of isolated or sporadic acts.'" *Cowell*, 263 F.3d at 292 (quoting *West*, 45 F.3d at 755).  The Court considers two factors when examining the applicability of the doctrine: "(1) whether the violations were related in subject matter; and (2) whether the acts were recurring." *Bennett v. Susquehanna Cnty. Children & Youth Svcs.*, 592 F. App'x 81, 84 (3d Cir. 2014) (citing *Cowell*, 263 F.3d at 292 & *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013)).  "[T]he Third Circuit has cautioned the continuing violations doctrine is not a substitute for a plaintiff's awareness of and duty to assert his/her rights in a timely fashion." *Smith v. Twp. of Warren*, No. 14-7178, 2016 WL 7409952, at *15 (D.N.J. Dec. 22, 2016) (quoting *Bennett*, 592 F. App'x at 85) (internal quotation marks omitted).  "[T]he continuing violations doctrine 'is not suited to cases . . . where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.'" *Sterling v. Redev. Auth. of*

Case 3:22-cv-01388-GC-LHG   Document 13   Filed 02/24/23   Page 23 of 27 PageID: 412

*Phila.*, 836 F. Supp. 2d 251, 260 (E.D. Pa. 2011) (quoting *Wilson v. Geisen*, 956 F.2d 738, 743 (7th Cir. 1992)).

The Court agrees with the Employer that the continuing violations doctrine will not serve to toll the Grievance Procedure's time limitations in the CBA.  Though the Arbitrator does not cite the continuing violations doctrine explicitly in explaining her findings, she found that the continuing negotiations between the parties released the Union from adherence to the Grievance Procedures until the CBA was executed.  (Op. 8, Pet. Ex. A.)  As stated, the Employer's refusal to implement the October 1 wage increase in 2020 constituted a single initiating occurrence, to which the Union was unequivocally alerted on October 30, 2020 when its employees did not receive the wage increase, and which should have precipitated a formal overture to engage in the CBA's dispute resolution mechanism.  Nothing prevented the Union from seeking the redress available to it under the Grievance Procedure; indeed, the Employer reminded the Union of its rights under the contract.  In assessing the factors, whether the violations were related in subject matter, and whether the acts were recurring, the violation was the failure to implement the wage increase, which was definite and discoverable in the employees' respective paychecks issued after October 1, 2020.  *Bennett*, 592 F. App'x at 84 (citing *Cowell*, 263 F.3d at 292 & *Mandel*, 706 F.3d at 166).  The continuing violations doctrine, therefore, is not applicable to the parties' negotiations.

Nor is the Union entitled to claim that the Employer waived its rights under the terms of the CBA by continuing to engage in efforts to resolve the dispute in good faith.  To the Union's contention that the parties waived the deadline to file a grievance by continuing to negotiate the disputed wage provision, the Employer asserts that the Union seeks to configure a policy that would chill settlement negotiations, such that "employers and unions could have no communications about the substance of a grievance outside the formal grievance procedures, else

they risk waiving the grievance structure altogether." (Pet'r's Reply 12 n.2.) The Employer analogizes the situation to that of a garden-variety employment dispute, during which the parties are free to discuss settlement, but such discussion does not waive the statute of limitations for filing an agency complaint. (*Id.* at 15.)

Moreover, the agreement explicitly determines the impact of a party's failure to avail itself of the grievance procedures, that "[a]ny grievance shall be considered as settled on the basis of the last answer of the Employer if not appealed to the next Step or arbitration within the time limitations stated above.  Time is of the essence." (Grievance Procedure, Effect of Failure to Appeal, TA § 8, Pet. Ex. B; Grievance Procedure, Effect of Failure to Appeal, CBA § 12.2, Pet. Ex. H.) The parties specifically indicated, and mutually assented, that the parties could rely on strict enforcement of the time limitations in the provision.  Further, at Step Two, the provision permits the Union to submit the disputed issue to mediation "within ten (10) calendar days after the receipt of the answer or expiration of the deadlines in Step 1, unless mutually extended, in writing, by the parties." (Grievance Procedure, Step Two, TA § 8, Pet Ex. B; Grievance Procedure, Step Two, CBA § 12.1, Pet Ex. H.) In addition to the emphasis on timeliness as a material element of dispute resolution, the parties explicitly limit their ability to waive the stated deadlines.  The Employer states that it "never agreed, in writing or otherwise, to waive the filing deadline for dispute resolution through the grievance procedure[,]" and the Court has discovered no record evidence to support the Employer's assent to such a waiver here. (Pet'r' Br. 6, ECF No. 2-1) The contract emphasized the materiality of the time limitations by providing that "[t]ime is of the essence."(Grievance Procedure, TA § 8, Pet Ex. B.) According to the terms of the CBA, without the written consent of the parties, as here, there is no waiver.

### D.    The Arbitrator's Decision Is Not Entitled to Deference

The Union emphasizes the heavy deference district courts afford an arbitrator's award, even if the arbitrator authors a decision replete with erroneous factual determinations or legal conclusions. (*See* Resp't's Cross-Pet. Br. 9 (citing *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597).)  The Union also maintains that the Arbitrator's selection of a remedy is entitled to the same deference as the Arbitrator's determination that a contractual violation occurred.  (*Id.* at 11  (citing *Teamsters Union Loc. 115 v. DeSoto, Inc.*, 725 F.2d 931, 937 (3d Cir. 1984).)

In response, the Employer acknowledges the deferential standard, but differentiates this case, arguing that the Arbitrator's "authority to decide whether the [G]rievance was timely does not mean that her decision and reasoning cannot be the subject of judicial scrutiny." (Pet'r's Reply Br. 3, ECF No. 9.)  In other words, the Employer argues that the CBA conferred jurisdiction upon the Arbitrator to adjudicate the timeliness issue, but this provisional authority did not permit her to alter or deviate from the terms of the CBA in rendering a decision.

In response to the Union's distinction between the Arbitrator's award and remedy, the Employer argues that "[the Union] is conflating [the Arbitrator's] decision as to the procedural arbitrability of the grievance with a remedy, even though these are completely different types of decisions."  (*Id.* at 5.)  The Employer stresses that it does not seek vacation of the award as a function of an improper remedy, but "because the grievance was not arbitrable in the first place," *i.e.*, because the wage dispute was time-barred.  (*Id.*)  The Employer contends that "the underlying record shows that the Arbitration Award was not rationally derived from the CBA, and thus it is not entitled to this Court's deference."  (*Id.* at 9 (citing *Newark Morning Ledger Co.*, 797 F.2d at 167.)

"It is, of course, fundamental that the authority of the arbitrator springs from the agreement to arbitrate." *Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125, 1131 (3d Cir. 1972). The CBA explicitly limits the Arbitrator's power:

> Authority of Arbitrator: The arbitrator shall not have jurisdiction to add to, modify, vary, change, or remove any terms of this Agreement or to determine that any provision of this Agreement establishes an implied limitation upon the Employer which is not herein specifically set forth. The scale of wages established by this Agreement shall not be changed by any arbitration decision.

(Arbitration, Authority of Arbitrator, TA § 9, Arbitration Clause, Pet. Ex. B; Arbitration, Authority of Arbitrator, CBA § 13.2, Pet. Ex. H.) The parties explicitly prohibited the Arbitrator from altering the terms of the CBA. These clear limitations in the CBA demonstrate that the Arbitrator acted outside of her authority in declining to enforce the plain language of the contract, *see Misco, Inc.*, 484 U.S. at 38 (explaining that an arbitrator "may not ignore the plain language of the contract"), and that her decision finds no basis in the CBA, *see Citgo Asphalt Refin. Co.*, 385 F.3d at 816 (quoting *Exxon Shipping Co.*, 73 F.3d at 1291).

## IV.    CONCLUSION

The Union did not file a formal grievance with the Employer within ten (10) days of the time at which it was made certain of the persisting disagreement, despite the Employer's earlier direction to the Grievance Procedure in the parties' communications. (*See* Email Exchange, October 12, 2020 3:00 PM email from James R. Redeker to Kevin O'Connor.) The time limitations of the Grievance Procedure were not extended mutually and in writing by both parties, per Step Two. The Union's responsibility to follow the grievance mechanism was not held in abeyance until the CBA's execution; upon ratification, the Union was required to follow the Grievance Procedure. The parties' subsequent engagement in negotiations motivated to resolve the substantive dispute are worthy of encouragement, but such consideration, however reasonable

did not toll the CBA's Grievance Procedure deadlines and the Arbitrator did not have the authority to modify the terms of the governing provision.  FAA, 9 U.S.C. § 10(a)(4).

For the foregoing reasons, and for good cause shown, Petitioner Stonemor Inc.'s Motion to Vacate Arbitration Award (ECF No. 2) is **GRANTED**.  Respondent International Brotherhood of Teamsters, Local 469's Cross-Motion (*see* ECF No. 4) is **DENIED**.  The Court vacates the Arbitrator's January 31, 2021 Opinion and Award (Op., Pet. Ex. A, ECF No. 1-2).  An appropriate Order follows.

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE